THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> *ex rel.* ALISHA KNIGHT, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> RELIANT HOSPICE, INC, RELIANT ) <br> MEDICAL PRODUCTS, INC, ) <br> TAMMY MCDONALD, and DAVID ) <br> MCDONALD, ) <br> ) <br> Defendants. ) <br> ) | 3:08-3724-CMC <br><br> **AMENDED COMPLAINT** <br><br> **[Jury Trial Demanded]** |

## PARTIES, JURIDICTION, AND VENUE

1.     Alisha Knight (the "Relator") is a citizen and resident of Lexington County, South Carolina and a former employee of Reliant Hospice Inc. Alisha Knight is the original source of the facts and information hereinafter set forth concerning the activities of the Defendants. The facts alleged herein are based upon her personal observation and documents in her possession.

2.     Reliant Hospice, Inc. ("Reliant") is a South Carolina corporation with its principal place of business in Lexington County, South Carolina.

3.     Reliant Medical Products, Inc. f/k/a Palmetto Medical Products, Inc. ("Reliant Medical Products) is a South Carolina corporation with its principal place of business in Lexington County, South Carolina.

4.     Upon information and belief, Defendants Tammy McDonald and David McDonald (collectively "the McDonalds") are husband and wife and reside in Lexington County, South Carolina.

5.     Jurisdiction is based on 31 U.S.C. § 3730.

6. At all times relevant hereto, the Defendants conducted substantial business within the State of South Carolina.

7. Reliant and Reliant Medical maintained permanent employees and/or offices within the State of South Carolina and therefore, are subject to personal jurisdiction in the State of South Carolina.

## BACKGROUND INFORMATION

8. The preceding paragraphs are re-alleged and incorporated as if fully set forth herein.

9. Pursuant to 31 U.S.C. §3730(2), the Relator prepared and served with the original complaint, a disclosure of information in her possession and of which she is the original source.

10. Reliant is a hospice treatment center engaged in providing palliative care to terminally ill patients.

11. Reliant received patients either through physician referrals or community referrals (e.g. family members).

12. Reliant receives payment for its hospice services through the Medicare and Medicaid programs.

13. Upon information and belief, the shareholders of Reliant are David McDonald, Tammy McDonald, Greg Kite, and Tony Chase.

14. At all times relevant hereto, Defendant Tammy McDonald served as President/CEO of Reliant and Defendant David McDonald served as Vice-President.

15. Upon information and belief, the McDonalds exerted control of Reliant at all times relevant hereto.

16. Reliant Medical is a medical supply company engaged in the business of providing medical equipment, like dialysis machines, to individuals.

17. Upon information and belief, the shareholders of Reliant Medical are Tammy McDonald and David McDonald.

18. At all times relevant hereto, Reliant Medical is the exclusive provider of medical equipment to Reliant.

19. Under the applicable statutes and regulations, in order to participate in the Medicare and Medicaid programs, Reliant must certify that it complies with all laws and regulations under the respective programs.

20. After joining the Medicare and Medicaid programs, Reliant engaged in a pattern of behavior to defraud the government by submitting fraudulent claims for payment.

21. This scheme was carried out by, among other things:

   a. Improperly admitting patients into the hospice program;

   b. Providing unnecessary services;

   c. Forging physician signatures on prescriptions;

   d. Forging physician signatures on patient Initial Plans of Care;

   e. Deleting and altering patient medical records;

   f. Providing kickbacks for patient referrals;

   g. Providing bonuses to its employees for recruiting new patients into the hospice program;

   h. Punishing employees who discharged patients that no longer needed or qualified for hospice services;

      i. Altering patient medical records without consulting with the patient's health care providers;

      j. Establishing shell companies to acquire new billing identities in order to avoid the federal government's Cap Audit; and

      k. Hiring medical directors as independent contractors, and failing to employ any licensed physician as a medical director.

22. In furtherance of this scheme, Reliant entered into an illegal referral agreement with Reliant Medical.

23. Upon information and belief, Reliant Medical conducts business through physician referrals. For example, if a physician's patient needs dialysis equipment, the physician would send a referral order for the patient to Reliant Medical.

24. The referral order contains a "face sheet" which provides Reliant Medical with confidential health care information for the patient.

25. In furtherance of its illegal referral agreement with Reliant, Reliant Medical faxed the confidential medical information received in the "face sheets" to the Relator.

26. The Relator then provided the "face sheet" to Reliant's clinical director who in turn used that information to solicit patients for Reliant.

27. The McDonalds used the proceeds from their ill-gotten gains to line their own pockets for personal use like vacations, vehicles, home improvement project and other personal items.

28. Reliant came under scrutiny as a result of this lawsuit and a federal government audit. The audit revealed that Reliant's practices resulted in gross overpayments by the

government. Furthermore, upon information and belief, the federal government found that Reliant had improperly billed the federal government millions of dollars.

29. The federal government stopped paying Reliant for its services to hospice patients but rather used all billings to pay down the amount of monies previously and improperly billed to and paid by the government.

30. Rather than pay the government back, Reliant, and the McDonalds concocted a scheme whereby they would continue to improperly bill the federal government through a patient "laundering" scheme.

31. The basics of the scheme are as follows:

   a. May 2010, Reliant sells its "assets," including its approximately fifty three patients, to Ascension Hospice ("Ascension").

   b. Ascension pays $278,000 for the equipment and patients.

   c. Ascension pays Tammy McDonald $12,500 per month as a consultant.

   d. Ascension bills and gets paid for services rendered to the patients it received from Reliant. If Reliant had retained these same patients, Reliant would not have been able to bill and collect monies for these patients.

   e. Tammy McDonald provides no service for the consultant contract money.

   f. Upon information and belief, the patients are not given a choice as to who can provide them their hospice care.

   g. At the same time as Ascension purchases Reliant, the McDonalds establish Ahava Hospice ("Ahava") and receive a new billing number for Ahava from the federal government. Ahava has five patients.

   h. In December of 2010, Ahava's census is still five patients.

  i. Upon information and belief, in 2009 and 2010, Ascension was audited by the federal government for its hospice charges. After conducting a Cap Audit, the federal government found that millions of dollars had been improperly billed and paid to Ascension. As a result, Ascension was not able to collect any of its billings from the federal government.

  j. Upon information and belief, Ascension needed another billing account in order to bill and get paid by the federal government for its hospice care.

  k. Just like the Reliant purchase, Ascension "sold" its assets, including its patients, to Ahava whose census went from five patients to over one hundred and twenty patients. The increase in patients was a direct result of Ahava's "purchase" of Ascension. Upon information and belief, to date, Ahava has paid no monies for the "purchase" of Ascension.

  l. Upon information and belief, the McDonalds own shares of Ahava and/or its parent company, Laten , Inc.

  m. In January of 2011, the McDonalds re-enacted the same shell game sham that had previously been conducted by Reliant and Ascension.

## ORIGINAL SOURCE INFORMATION

32. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

33. The Relator was originally hired by Reliant in September 2006 as an Office Manager.

34. At that time, the Relator's job duties included overseeing payroll preparation, handling Reliant's human resource needs, ordering supplies, interviewing new employees, hiring office staff, handling employee discipline issues, and overseeing employee files.

35. As Office Manager, the Relator personally delivered pay stubs for the "admission bonuses" that the clinical staff received for admitting new patients.

36. At this time, the clinical staff received an admission bonus whenever they recruited more than ten new patients in a month.

37. During this time, the admission bonus was calculated on a per patient basis, so that the clinical staff received approximately $75 for each patient recruited once they recruited more than ten patients in a month.

38. In November 2006, the Relator was promoted to acting Office Administrator.

39. At the time of the promotion, Tammy McDonald was pregnant and expected to take maternity leave upon the birth of her child.

40. In or around December 2006, Reliant received a subpoena from the Office of the Inspector General ("OIG") requesting, among other things, copies of all patient records, physician orders, admission documents, and clinical notes.

41. Tammy McDonald, Tony Chase (shareholder of Reliant), Angie Albright (Reliant's then clinical director), and the Relator worked to pull and copy the subpoenaed documents.

42. Tony Chase printed the surveyor reports of the clinical notes for each patient. These reports were placed in expandable files with the patient names and provided to the OIG.

43. Tammy McDonald personally reviewed Reliant's documents and then pulled the documents she wanted copied.

44. She gave these documents to either Angie Albright or the Relator, who then copied them and reassembled the file.

45. During the review process, several unsigned physician orders were discovered.

46. Reliant previously used these unsigned orders to justify a patient's participation in the hospice care program and receive payments for hospice services provided from both Medicare and Medicaid.

47. On at least one occasion after locating an unsigned Hospice Certification and Plan of Care, Tammy McDonald told the Relator "if you don't want to see this, turn your head."

48. Tammy McDonald then forged the physician's signature on the Certification and Plan of Care and included it in the documents produced in response to the OIG subpoena.

49. Relator also has in her possession other forgeries committed by Tammy McDonald.

50. The Relator assisted in the copying of the requested documents, including those that contained forged physician signatures.

51. These documents were then submitted to the OIG in response to the subpoena.

52. Shortly after submitting the forged documents in response to the OIG subpoena, Tammy McDonald took maternity leave.

53. As a result, Reliant needed an administrator to oversee its business activities and in January 2007, the Relator was promoted to Office Administrator on a permanent basis.

54. As Office Administrator, the Relator's job duties were expanded to include oversight of the entire day-to-day running of Reliant.

55. During this period, the Relator would receive phone calls from David McDonald at Reliant Medical inquiring as to whether Reliant had received "face sheets" for prospective new patients that Reliant Medical recruited for Reliant.

56. David McDonald instructed the Relator never to tell the patient or the patient's family where the referral came from. The Relator was also instructed to label these patients as "community referral" instead of "physician referral."

57. The Relator received numerous phone calls from patients and patient family members asking how Reliant received their name and wondering why they were being contacted by a hospice center.

58. The Relator told the patients that the clinical director would call them back.

59. As a result of recruiting these patients, Reliant Medical received a contract to be the exclusive provider of medical equipment to Reliant.

60. As Reliant recruited its patients through this illegal scheme with Reliant Medical, it engaged in a pattern of admitting patients that did not qualify for hospice care under either the Medicare or Medicaid programs.

61. During this period, Reliant routinely disciplined or fired any medical providers who discharged patients.

62. Reliant maintained a group of physicians to act as "Medical Director" for the hospice program.

63. None of these physicians were employees of Reliant, instead Reliant, in violation of federal regulations, treated each of the physicians as independent contractors.

64. The Relator personally distributed to the physicians their respective 1099 forms labeling them as independent contractors.

65. At least one of the medical directors was dismissed as a medical director for discharging patients who did not qualify for hospice care.

66. Angie Albright, Reliant's Clinical Director, resigned in June 2007 after being disciplined for discharging patients that did not qualify for hospice care.

67. In January 2008, Medicare submitted an audit request to Reliant for Patient A.

68. The Relator received the audit request and provided it to Heidi Davis, Reliant's medical records custodian.

69. The Relator also informed Tammy McDonald of the audit request.

70. Tammy McDonald pulled Patient A's file and took it home with her.

71. Between January 15, 2008 and January 30, 2008, Tammy McDonald changed the clinical indicator and diagnosis codes in Patient A's records and updated four nursing notes. Bates No. 00186

72. On January 29, 2008, Tammy McDonald altered Patient A's medical note number 1356 to change the clinical indicator and diagnosis but dated the update as May 1, 2007 in the actual note.  Compare Bates No.00186 and 00213.

73. Reliant accepted Patient A into the hospice program under a diagnosis of end stage cardiac disease.

74. Reliant submitted Patient A as a Medicare patient.

75. However, the facts did not support a diagnosis of end stage cardiac disease.

76. As a result, Tammy McDonald, without physician approval, changed the diagnosis to end-stage pulmonary disease and then submitted the altered records to Medicare in response to the audit request.

77. In July 2007, Relator received a bill from Palmetto Richland ER for treatment received by Patient B, a Reliant patient.

78. On April 10, 2007, Patient B went to Palmetto Richland ER for treatment of heart disease.

79. Palmetto Richland submitted the bill to Reliant since the treatment was for complications of Patient B's hospice diagnosis.

80. On August 14, 2007, Tammy McDonald wrote a letter to Palmetto Richland explaining that Reliant was not responsible for the bill because Patient B did not seek prior approval from Reliant for the ER treatment. Bates No. 00184

81. The letter refers to a patient note (Bates No. 00183) dated April 10, 2007, note number 10177, but the note was not actually created until August 7, 2008 (bates no. 00181).

82. Ms. McDonald created this note to justify non-payment of medical services that should have been covered under Patient B's hospice treatment plan.

83. In the summer of 2008, the Relator also discovered that Tammy McDonald and other Reliant employees altered the notes of Reliant Patients D, E, F, G, H, I, and J without authorization from the patients' health care provider

84. On September 8, 2008, Reliant's Clinical Director, at the direction of Tammy McDonald, deleted nurse note #31858 from Patient D's medical charts.

85. On June 29, 2007, Tammy McDonald altered nurse notes #4842 and #4769 in Patient E's medical charts without receiving approval from Patient E's health care provider. Bates No. 00227 and Bates No. 00232.

86. Tammy McDonald altered at least seven different nursing notes in Patient F's medical charts without receiving prior approval from Patient F's health care provider.

87. On July 11, 2007, Tammy McDonald altered Patient G's nursing note #4712 dated June 18, 2007; nursing note #5089 dated July 3, 2007; nursing note #4983 dated July 2, 2007; nursing note #4942 dated June 29, 2007; nursing note #4859 dated June 26, 2007; nursing note #4858 dated June 20, 2007; and nursing note #4941 dated June 25, 2007. She altered each of these notes again on July 17, 2007. Bates No. 00318, Bates No. 00336, Bates No. 00342

88. On July 11, 2007, Tammy McDonald altered Patient H's nursing note #4866 dated June 26, 2006; nursing note #5008 dated July 3, 2007, nursing note #5150 dated July 10, 2007; and nursing note #4732 dated June 19, 2007. These alterations were made without approval from Patient H's health care provider. Bates No. 00240; Bates No. 00245; Bates No. 00251; Bates No. 00257.

89. On August 7, 2007, Tammy McDonald altered Patient I's nursing note #10174 dated July 12, 2007. This alteration was made without approval from Patient I's health care providers. Bates No. 00264

90. On July 17, 2007, Tammy McDonald altered Patient J's nursing note #4723 dated June 18, 2007; nursing note #4869 dated June 26, 2007; nursing note #4970 dated July 2, 2007; nursing note #5157 dated July 10, 2007; nursing note #5239 dated July 12, 2007; and nursing note #5241 dated July 12, 2007. These alterations were made without approval from Patient J's health care providers.

91. Reliant used each of the altered records to justify the respective patients' continued participation in the hospice program and receive payments for hospice services under the Medicare and/or Medicaid programs.

92. As a result of the respective patients' continued participation in the hospice program, Reliant Medical and Reliant received payments under the Medicare and/or Medicaid programs to which they were not entitled to receive.

93. The McDonalds used their positions of authority and control over Reliant and Reliant Medical to divert the ill-gotten monies for their personal use.

## **FIRST CAUSE OF ACTION**
### [Violations of False Claims Act – All Defendants]

94. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

95. In order to acquire federal funds Reliant engaged in fraudulent activity by submitting claims that it knew were false. Specifically, Reliant submitted claims that it knew to be false.

96. In order to acquire federal funds Reliant engaged in fraudulent activity by submitting statements in support of claims that it knew were false.

97. In order to acquire federal funds, Reliant used physician orders that had not been reviewed by a licensed physician to induce the government to pay federal funds for hospice care.

98. Moreover, Reliant entered into a scheme whereby it formed shell companies to acquire new billing codes in order to circumvent its obligation to repay the federal government for some of their ill-gotten gains.

99. Reliant submitted claims to both the Medicare and Medicaid programs that it complied with all regulations and laws for those programs.

100. When it made this certification, Reliant knew that it was not complying with the applicable laws and regulations for participation in those programs.

101. As a result of Reliant's false claims, the government reimbursed Reliant for hospice treatment that it provided.

102. The United States was damaged as a result of Reliant's submission of false claims and false statements in support of claims.

103. The Relator has direct and independent knowledge of the facts underlying the complaint, and the facts and allegations underlying this complaint have not been publicly disclosed as defined under the False Claims Act.

## SECOND CAUSE OF ACTION
### [Civil Conspiracy – All Defendants]

104. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

105. As alleged hereinabove, the Defendants engaged in a conspiracy to rob the federal government.

106. Reliant, the McDonalds, and Reliant Medical Products conspired together to submit false claims for payment from the Medicare and Medicaid programs.  Furthermore these Defendants conspired to create a shell game of companies wherein they could launder patients in order to continue to make and receive payments under fraudulent pretenses.

107. As a result of the conspiracy between the Defendants, the government paid claims that it would not otherwise have paid.

108. The Defendants entered into a fraudulent kick-back scheme whereby Reliant recruited patients from Reliant Medical based on confidential patient information in Reliant Medical's custody and care and Reliant Medical received an exclusive contract to provide medical equipment for Reliant.

109. Reliant then submitted the patients it illegally recruited from Reliant Medical for participation in the Medicare and Medicaid programs.

110. Reliant then awarded Reliant Medical contracts to provide medical equipment to Reliant's Medicare and Medicaid patients.

111. As a direct result of the conspiracy between the Defendants, the United States government was defrauded.

## THIRD CAUSE OF ACTION
### [Alter Ego/Piercing Corporate Veil – The McDonalds]

112. Plaintiff re-alleges and incorporates the preceding paragraphs as if fully set forth herein.

113. Plaintiff is informed and believes that Tammy McDonald and David McDonald, individually and jointly, are the alter egos of Reliant and Reliant Medical Products.

114. At all times relevant hereto, Tammy McDonald and David McDonald, individually and jointly, exerted control over Reliant and Reliant Medical Products..

115. Reliant and Reliant Medical Products did not have a functioning corporate structure, were incapable of making decisions, and failed to follow the corporate formalities applicable to South Carolina corporations.

116. At all times relevant hereto, Reliant and Reliant Medical Products operated as façades for the actions and benefit of Tammy McDonald and David McDonald, individually and jointly, such that the interests of the McDonalds were identical to the interests of Reliant and Reliant Medical Products.

117. Tammy McDonald and David McDonald, individually and jointly, actively participated in the scheme to defraud the United States government; including, among other things:

    a. Creating incentive bonuses for Reliant's employees to admit new patients and keep current patients enrolled in hospice care;

    b. Personally destroying documents subpoenaed by the OIG;

    c. Personally forging physician signatures on patient records;

    d. Personally instructing employees, including the Relator, to never tell Reliant's patients how Reliant Medical received a referral to provide medical supplies;

    e. Personally altering patient's electronic clinical indicator and diagnosis codes;

    f. Personally backdating the altered patient records;

    g. Personally deleting nurse notes from patients' records;

    h. Personally accepting "consulting" fees without performing any services for said fees; and

    i. Personally forming shell companies in order to circumvent their obligation to repay Reliant's ill-gotten gains

118. Upon information and belief, the McDonalds, individually and jointly, made decisions concerning Reliant and Reliant Medical's finances by participating in a fraudulent scheme to defraud the United States government and divert the illegally obtained funds for their personal use to the detriment of Reliant, Reliant Medical, and their creditors, including the United States government.

119. Among other things, the McDonalds, individually and jointly, used the ill-gotten monies to, among other things: fund lavish personal vacations, throw extravagant parties, obtain personal automobiles, fund massive home improvement projects, and purchase a myriad of personal items for their own use and enjoyment.

120. As a result of the McDonalds' diversion of Reliant and Reliant Medical's funds to their own benefit, Reliant has been left under-capitalized and without sufficient resources to repay the monies it defrauded from the United States government.

121. Based on the forgoing, it would be inequitable to allow Reliant and Reliant Medical to utilize their corporate status to shield the McDonalds, individually or jointly, from Plaintiff's claims.

122. Plaintiff therefore seeks a declaration from this Court finding that Tammy McDonald and/or David McDonald are alter egos of Reliant and/or Reliant Medical Products and hold these parties jointly and severally liable for the acts and omissions of Reliant and Reliant Medical Products as set forth hereinabove.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court enter judgment on behalf of the Plaintiff and against the defendants, jointly and severally, plus prejudgment interest together with reasonable attorney's fees and for such other and further relief as the Court deems equitable and just.

This the 11th day of April, 2011

____/s/ Peter D. Protopapas_____
Peter Protopapas
Federal Bar # 7700
Rikard Moses & Protopapas, LLC
1803 Hampton Street
Columbia, SC 29201
803-978-6111
pdp@rmpfirm.com

Alexandre N. MacClenahan
Federal Bar # 9593
The MacClenahan Law Firm, LLC
819 E. North Street

        Greenville, SC 29601
        864-382-3340
        alex@macclenahanlaw.com

3:08-cv-03724-CMC     Date Filed 04/11/11    Entry Number 66      Page 18 of 18